### S. P. WARD v. THE STATE.

No. 2379. Decided May 7, 1913.

Rehearing denied June 27, 1913.

**1.—Murder—Evidence—Res Gestae—Declarations of Deceased.**

Where, upon trial of murder, the evidence showed that after deceased was cut with a knife by defendant, he turned and rode home and in ten or fifteen minutes thereafter told his wife that he was suffering, and that it appeared to her that he was in a dying condition; that they had to help him from his horse, etc., there was no error in admitting his statements that the defendant cut him with a knife, and other acts and words attending the homicide.

**2.—Same—Rule Stated—Res Gestae Statements.**

Res gestae statements of the deceased voluntarily and continuously made at the time of the transaction, or so near to it as to reasonably preclude the

idea of design, are to be regarded as contemporaneous, and are admissible in evidence.

### 3.—Same—Rule Stated—Res Gestae Statements.

Res gestae statements need not be coincident as to time if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate. Following Rainer v. State, 67 Texas Crim. Rep., 87.

### 4.—Same—Evidence—Motive.

Where, upon trial of murder, it developed that the killing took place over a difference claimed to be due deceased by defendant, and defendant attempted to prove that said debt had been paid, it was not improper to permit the State to show what the witness had heard the defendant say about the matter.

### 5.—Same—Evidence—Intoxicants—Condition of Deceased.

Where, upon trial of murder, it was shown that the only intoxicants in possession of deceased at the time of the homicide were received from the express office, there was no error in excluding testimony that some time during the summer preceding the difficulty the witness had seen deceased intoxicated, etc., there being no connection shown.

### 6.—Same—Dying Declarations in Evidence.

Upon trial of murder, it was shown that the deceased made the statement which was offered as his dying declaration without any interruption and not in answer to questions propounded calculated to lead the deceased to make a particular statement, there was no error, the court submitting a proper charge thereon. Following Taylor v. State, 38 Texas Crim. Rep., 552, and other cases.

### 7.—Same—Charge of Court—Dying Declarations—Words and Phrases.

Where, upon trial of murder, the evidence excluded the idea that deceased at the time he made his dying declaration had any hope of recovery, there was no error in the court's charge in omitting that part of the statute which requires that the deceased had no hope of recovery, the charge being otherwise sufficient and no injury resulting to defendant. Following Taylor v. State, 38 Texas Crim. Rep., 552.

### 8.—Same—Witness Under Rule—Discretion of Court.

Upon trial of murder, where defendant requested that the brother of the deceased be placed under the rule with the other witnesses, and the State stated that it needed and desired his assistance in the trial of the case and that he be excused from the rule, there was no error in the exercise of the court's discretion, no abuse thereof having been shown, the witness having been instructed not to communicate with any person about the case.

### 9.—Same—Husband and Wife—Cross-examination.

Where defendant's wife was placed upon the witness stand and testified without objection as to defendant's acts after the homicide; that neither he nor she went to the house of the deceased after he was cut, etc., and the only objection was to the facts brought out that the witness did not attend the funeral of deceased, on the ground that this was irrelevant, but the wife was not compelled to testify as to new matters, and against the defendant, and besides, the same testimony was introduced by other witnesses; it being disclosed that the deceased was her son-in-law and that friendly feeling should have existed, there was no error in admitting this evidence to show the bias of the witness.

### 10.—Same—Rule Stated—Bias of Witness—Practice.

Where, upon trial of murder, the State was permitted to introduce testimony to show the bias of defendant's wife as a witness without objection, com-

plaints to said testimony in the motion for new trial came too late. Qualifying Brock v. State, 44 Texas Crim. Rep., 335.

### 11.—Same—Rule Stated—Objections to Testimony.

A party can not be heard to complain of illegal and incompetent evidence to which he did not object and except to at the time of its introduction, and which he made no motion to exclude during the trial of the case. Following Wright v. State, 35 Texas Crim. Rep., 367, and other cases.

### 12.—Same—Evidence—Instrument Used.

Where a knife was exhibited to the defendant while on the witness stand which he stated was the knife with which he cut deceased, and the State thereupon showed that the defendant had another knife which he had sharpened shortly before the homicide, and it appeared from the character of the wound that whatever knife defendant used was a deadly weapon in the manner in which it was used by defendant, there was no error in admitting this testimony, and the court's failure to charge on aggravated or simple assault under articles 1147 and 1150, Revised Penal Code; however, the court charged on manslaughter, and there was no error.

### 13.—Same—Evidence—Means Used—Deadly Weapons.

Where, upon trial of murder the evidence showed that the deceased attempted to use a large sized pocket-knife, there was no error in refusing expert testimony on the basis of hypothetical questions that the same was a deadly weapon, as this was a matter of common knowledge.

### 14.—Same—Evidence—Instrument Used—Deadly Weapon—Charge of Court.

Where, upon trial of murder, the defense introduced testimony that deceased attempted to use a large sized pocket-knife and threatened to kill defendant and then reached in his pocket as if attempting to draw a pistol and struck at defendant twice with a knife, and the court, in his charge, instructed the jury that if deceased did these acts or in case of a reasonable doubt to acquit defendant, this was a sufficient submission of the law of the presumption that the deceased intended to kill or to inflict serious injury, and there was no reversible error in the court's failure to admit answers to hypothetical questions as to the character of the knife, or his failure to charge the exact words of the statute on the presumption of the intent of deceased.

### 15.—Same—Charge of Court—Self-defense.

Where, upon trial of murder, the defense introduced testimony that the deceased at the time of the homicide was attempting to draw a pistol or knife to kill the defendant, and the court instructed the jury that in such case the defendant had a right to cut and stab the deceased in self-defense, and otherwise submitted a proper charge on self-defense, there was no error.

### 16.—Same—Serious Bodily Injury—Great Bodily Injury—Charge of Court.

Where the court in defining self-defense used the words "great bodily injury," instead of "serious bodily injury," yet when he came to apply the law to the facts, he used the words "serious bodily injury," there was no error, besides, the words "great" and "serious" in substance mean the same thing.

### 17.—Same—Charge of Court—Self-defense—Force.

Where, upon trial of murder, the court, in his charge on self-defense, in his general definition, instructed the jury that the defendant was justified in using all necessary and reasonable force to defend himself, but in applying the law to the facts omitted the use of these words as to what force was necessary, and correctly applied the law to the facts, there was no reversible error, although said words should not have been used in the instant case, or in any case where the evidence does not raise the issue. Following Moss v. State, 60 Texas Crim. Rep., 268. Distinguishing Castro v. State, 66 Texas Crim. Rep.,

282; Antu v. State, 66 Texas Crim. Rep., 329; Mayhew v. State, 65 Texas Crim. Rep., 290.

### 18.—Same—Rule Stated—More Force Than Necessary.

Where the court, in applying the law to the case, correctly does so, some error in the definition of a general principle which could not have misled the jury is no ground for reversal, and this rule will be adhered to, although trial courts are warned not to use the words of more force than necessary in their charge on self-defense unless it is an issue in the case.

### 19.—Same—Evidence—General Reputation.

Where, upon trial of murder, the court admitted testimony that defendant's general reputation was that of a peaceable law-abiding citizen and good in the community where he lived, there was no error in excluding testimony of the individual opinion of a witness.

### 20.—Same—Jury and Jury Law—Special Venire.

Where defendant's motion to quash the special venire was overruled for good reasons, and besides, the record showed that the defendant secured a jury satisfactory to him without exhausting his challenges, there was no error.

### 21.—Same—Continuance—Bill of Exceptions.

In the absence of a bill of exception, the overruling of a motion for continuance can not be reviewed.

### 22.—Same—Evidence—Expert Testimony—Cause of Death.

Where defendant contended that the wounds of the deceased had not been properly treated and that deceased had not died therefrom, it was proper to permit the State to show by the examining physicians the depth, course, and character of the wound, although the defense tendered no witness, but only insisted on introducing medical books and propounding questions thereon.

### 23.—Same—Evidence—Dying Declarations—Predicate.

Where defendant contested the admissibility of dying declarations, there was no error in permitting the State to prove that the deceased at the time of making them was sane, conscious of approaching death and had no hope of recovery.

### 24.—Same—Evidence—Clothing of Deceased.

Upon trial of murder, there was no error in admitting in evidence the clothing of the deceased to show the location, nature and character of the wound which were questioned by the defendant.

### 25.—Same—Evidence—Acts of Deceased.

Where defendant introduced testimony that deceased offered to buy a pistol a few days before the homicide, there was no error in permitting the State to show that this was before there was any enmity between the parties.

### 26.—Same—Condition of Deceased—Evidence—Repetition.

Where the witness had several times testified to what she knew about the appearance and condition of deceased before the homicide, there was no error in excluding testimony as to what she told another witness.

### 27.—Same—Evidence—General Reputation.

Where defendant placed in evidence the issue of his general reputation as a peaceable man, it was harmless error to ask him whether he had not, prior to said difficulty, broken a couple of ribs of a third party, to which he answered in the negative.

**28.—Same—Evidence—Contradicting Witness.**

Where the wife of deceased had testified that she was picking cotton and saw the defendant strike the deceased, and defendant offered testimony tending to show that her view was obstructed at this point; that she could not have seen the transaction, there was no error in permitting the State to show that the witness could have seen the transaction.

**29.—Same—Evidence—Contradicting Witness.**

Where the bill of exceptions did not present any error with reference to contradicting a State's witness to the effect that he saw the knife of the deceased a few moments after the killing, etc., there was no error.

**30.—Same—Colloquy Between Court and Counsel—Remarks by Judge.**

Where counsel persisted in asking questions to which objections had been sustained, and a colloquy between the court and counsel arose in which the court threatened to fine the counsel, but did not make any comment on the testimony excluded to indicate his opinion of the merits of the case, there was no reversible error, although these matters are to be regretted.

**31.—Same—Rule Stated—Practice.**

While it would be better practice, where the court feels constrained to criticise counsel not to do so in the presence of the jury, yet it is never proper for counsel to state in the presence and hearing of the jury what the testimony of the witness would be were he permitted to testify.

**32.—Same—Sufficiency of the Evidence—Charge of Court.**

Where, upon trial of murder, the evidence sustained a conviction of murder in the second degree, under a proper charge of the court, there was no error.

Appeal from the District Court of Navarro. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of murder in the second degree; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*Stennis & Wilson,* and *W. F. Ramsey,* for appellant.—On question of court's charge that defendant must not use more force than necessary, etc.: Mayhew v. State, 65 Texas Crim. Rep., 290, 144 S. W. Rep., 229; Castro v. State, 66 Texas Crim. Rep., 282, 146 S. W. Rep., 553; Antu v. State, 66 Texas Crim. Rep., 329, 147 S. W. Rep., 234; Carson v. State, 57 Texas Crim. Rep., 394; Huddleston v. State, 54 id., 93; Rice v. State, 51 id., 255; Terrell v. State, 53 id., 604; Hightower v. State, 56 id., 248; Scott v. State, 46 id., 305; Aycock v. State, 55 id., 142.

On question of the court's failure to charge on legal presumption as to instrument used by deceased: Hudson v. State, 59 Texas Crim. Rep., 650, 129 S. W. Rep., 1125; Edwards v. State, 151 S. W. Rep., 294; Williams v. State, 65 Texas Crim. Rep., 437, 144 S. W. Rep., 620; Foster v. State, 67 Texas Crim. Rep., 5, 148 S. W. Rep., 583; Duke v. State, 56 Texas Crim. Rep., 502, 120 S. W. Rep., 894; Pierce v. State, 21 Texas Crim. App., 540; Ward v. State, 30 id., 687; Scott v. State, 42 Texas Crim. Rep., 607; Cooper v. State, 85 S. W. Rep., 1059; Polk v. State, 60 Texas Crim. Rep., 499,

132 S. W. Rep., 767; Cochran v. State, 13 S. W. Rep., 651; Tubb v. State, 55 Texas Crim. Rep., 606, 117 S. W. Rep., 858.

On question of charge on dying declarations: Craven v. State, 49 Texas Crim. Rep., 78, 90 S. W. Rep., 311; Phillips v. State, 50 Texas Crim. Rep., 127, 94 S. W. Rep., 1051.

On question of court's failure to charge on aggravated assault: Wilson v. State, 49 Texas Crim. Rep., 50, 90 S. W. Rep., 312; Jones v. State, 153 S. W. Rep., 310; Snoberger v. State, 58 Texas Crim. Rep., 530, 126 S. W. Rep., 878; Lucas v. State, 49 Texas Crim. Rep., 135, 90 S. W. Rep., 880; Terrell v. State, 53 Texas Crim. Rep., 604, 111 S. W. Rep., 152; Ross v. State, 61 Texas Crim. Rep., 12, 133 S. W. Rep., 688; Thompson v. State, 6 S. W. Rep., 296; Vinson v. State, 55 Texas Crim. Rep., 490; McDowell v. State, 55 id., 596; Hightower v. State, 56 id., 248.

On question of the court's charge on using the words, "great bodily harm," instead of "serious bodily injury": Castro v. State, 66 Texas Crim. Rep., 282, 146 S. W. Rep., 553; Jones v. State, 71 S. W. Rep., 962; Aycock v. State, 55 Texas Crim. Rep., .142; Simmons v. State, 55 id., 441.

On question of failure to lay proper predicate for introduction of dying declarations: Drake v. State, 25 Texas Crim. App., 293; Arnwine v. State, 50 Texas Crim. Rep., 254; Adams v. State, 19 S. W. Rep., 907.

On question of cross-examination of defendant's wife: Richards v. State, 53 Texas Crim. Rep., 400; Hobbs v. State, 53 id., 71; Stewart v. State, 52 id., 273; Jones v. State, 51 id., 472; Brock v. State, 44 id., 335; Davis v. State, 45 id., 292; Spivey v. State, 45 id., 496; Moore v. State, 45 id., 234; Woodall v. State, 58 id., 513; Yeiral v. State, 56 id., 267; Jones v. State, 51 Texas Crim. Rep., 472, 101 S. W. Rep., 993.

On question of permitting wife to testify as to bloody condition of her husband: Rice v. State, 51 Texas Crim. Rep., 255, 103 S. W. Rep., 1156; Cole v. State, 75 S. W. Rep., 530.

On question of general reputation of defendant: Tyler v. State, 79 S. W. Rep., 558; Reid v. State, 57 S. W. Rep., 662.

On question of remarks by judge: Simmons v. State, 55 Texas Crim. Rep., 441; Moore v. State, 33 id., 306; Kirk v. State, 35 id., 224; Rice v. State, 51 Texas Crim. Rep., 255, 103 S. W. Rep., 1156.

On question of refusing to put deceased's brother under rule: Smith v. State, 52 Texas Crim. Rep., 80; Welhousen v. State, 30 Texas Crim. App., 623; Heath v. State, 7 id., 464.

On question of refusing opinion of defendant's witness that knife used by deceased was a deadly weapon: Hudson v. State, 59 Texas Crim. Rep., 650, 129 S. W. Rep., 1125.

*C. E. Lane*, Assistant Attorney-General, and *Luther A. Johnson*, for the State.—On question of refusing to quash special venire: Lewis v..

State, 15 Texas Crim. App., 647; Suit v. State, 30 id., 319; Jackson v. State, 30 id., 664; Taylor v. State, 14 id., 340.

On question of cross-examination of wife: Dobbs v. State, 54 Texas Crim. Rep., 550; Cremore v. State, 34 Texas, 173; Buchanan v. State, 41 Texas Crim. Rep., 127; Merritte v. State, 40 id., 359; Swaney v. State, 66 Texas Crim. Rep., 293, 146 S. W. Rep., 548.

On question of court's charge on self-defense: Summers v. State, 66 Texas Crim. Rep., 551, 148 S. W. Rep., 774; Waechter v. State, 34 Texas Crim. Rep., 297; Castillo v. State, 31 id., 145; Fonseca v. State, 48 id., 28.

HARPER, JUDGE.—Appellant was prosecuted and convicted of murder in the second degree, and his punishment assessed at ten years confinement in the State penitentiary.

The record in this case is very voluminous, there being very near one hundred bills of exception, and to take up and discuss each of them in detail would render this opinion too lengthy, but we will endeavor to discuss each question involved in the different bills, taking a number of them together where they relate to the same matter.

In bills of exception Nos. 24, 25, 26, 27, 28, 29, 30, 31, 32, 34, 35, 36 and 37 objections are urged to various portions of the testimony of Mrs. Lou Davis, the wife of deceased. In bills of exception Nos. 44, 45 and 46 objections are made to the testimony of J. R. McCarter. These are kindred bills and are governed by the same rules of law. It appears from the record that deceased was a son-in-law of appellant. The homicide occurred in the early fall of 1911. Prior to that year appellant had lived in Parker County and deceased in Navarro County. The first of the year deceased had gone to Parker County and assisted appellant in moving to Navarro County, and during the year 1911 they were neighbors, and at times had swapped work, appellant being allowed to milk some of deceased's cows. Some ten days prior to the homicide a wordy altercation occurred between them, and appellant ceased to milk the cows of deceased, and turned them out. There are different views in the record as to this altercation, but we deem it useless to recite the circumstances, but cite the occasion as the one on which it seems the friendly relations ceased. Deceased moved off the premises, however, and it is not shown that any other trouble ensued until the day of the homicide. Of the events occurring at the time of the homicide there are two versions. The State contends when the two men met appellant asked deceased if he still contended he owed him $44. Upon deceased replying affirmatively other words followed, when appellant cut deceased. As he inflicted the first wound deceased reached in his pocket for his knife, and as he did so appellant cut him again, when deceased dropped his knife unopened, spurred his horse and rode off. Appellant contends as deceased rode up, he spoke to him, when deceased replied: "Go to hell, G—d d—n you, I have come here to kill you," pulled his knife and struck at appellant twice, when appellant says he inflicted

the fatal wound. This is a sufficient statement as it will be necessary to refer to the evidence further in discussing the numerous bills of exception.

After receiving the cut deceased rode a short distance, calling his wife. She says: "When I got to him he was just as bloody as he could be from here down, and I noticed there was a great bulge there. When I say here I mean his stomach. His entrails were not exposed at that time. I could just see the bulge of them through his shirt. I could tell from his demeanor, what he said, how he looked and acted when he was in pain or suffering. The condition he was in when I met him, he was dying, and his looks showed it. He was suffering; he was sitting there saying, 'Oh Lordy, or Lordy, my stomach.' After I got under the fence and close to my husband he said, 'Your papa cut me, he cut me twice. He stepped out in the road and said, Morgan, do you claim that I still owe you that $44, and I said yes, and he jumped out in the road and cut me twice,' and he said, 'Oh, I was never so surprised.' He said he was dying."

J. R. McCarter testified: "Mrs. Davis called me and I started in a run. I was about thirty steps from her when she went under the fence. When I got to Morgan Davis (deceased) I caught him just as soon as I could get to him. I saw that he was falling off his horse. Morgan's head was coming right towards the ditch by the fence, and I pushed him back on the horse, and put my foot in the stirrup and went up behind him. Morgan was just as limber as one of the bridle reins, and he threw his head back on my shoulder and groaned. When he threw his head on my shoulder he told me that he was riding down the road by Mr. Ward's house, and he had passed the house and got down the road a little below the house he met Mr. Ward in the road, and said Mr. Ward stopped him and asked if he (Davis) still claimed that he (Ward) owed him $44, to which question he answered, 'Yes,' when appellant (Ward) jumped at him, grabbed his horse and cut him."

Appellant objected to all this testimony, giving a number of reasons. The evidence shows this was not over ten or fifteen minutes after he was cut; that he rode direct towards his home, and when he saw his wife, called; that he was suffering, and the evidence clearly shows that this testimony was admissible as res gestae of the transaction. Recently, in the case of Rainer v. State, 67 Texas Crim. Rep., 87, 148 S. W. Rep., 735, we had occasion to review the authorities and reiterated the rule: "If the declarations appear to spring out of the transaction, if they elucidate it, if they are voluntary and spontaneous, and made at a time so near to it as to reasonably preclude the idea of design, then they are to be regarded as contemporaneous and are admissible." We also quoted approvingly from Mr. Wharton: "They need not be coincident as to time if they are generated by an excited feeling which extends without break or let down from the moment of the event they illustrate. In other words, they must stand in immediate casual relation to the act, and become part either of the action immediately producing it, or

of the action which it immediately produces. Incidents which are thus immediately and unconsciously associated with an act, whether such incidents are doing or declarations, become in this way evidence of the character of the act." In the Rainer case will be found a long list of authorities both from this and other States. In this case there was no break or let down; his condition and the circumstances conclusively exclude the idea of design, and it is but the event speaking through the deceased. And it was permissible to show that when deceased arrived home what then was his condition, and that he had to be helped in the house. This all went to show the nature and character of the wound, and especially in the light of appellant's effort to show that the wound was not the cause of the death, but it occurred by the use of improper sutures.

As it appeared from the above that the State's theory was that the killing took place over a difference claimed to be due of $44, it was not improper to permit Mrs. Davis to testify what she heard her father (appellant) say about the matter. Appellant on cross-examining this witness attempted to prove that the debt had been paid; then on redirect examination it was permissible for the State to prove what she of her own knowledge knew of the transaction. Appellant asked this witness on cross-examination when was the last time her husband was at Teague. Defendant stated he expected to prove a recent trip, and that deceased went there to get intoxicants. As the only intoxicants shown to have been in possession of deceased at the time of the homicide was shown to have been received from the express office, the evidence would be immaterial and irrelevant, as would the testimony of McCarter that some time during the summer preceding the difficulty he had seen deceased intoxicated. However, in approving the bills as to this latter part, the court states he told appellant's counsel the testimony would be admitted if he expected to show such evidence had any connection with the difficulty. We fail to see how the fact that deceased may have been drunk the summer before, or had been to Teague prior to the difficulty and secured intoxicating liquors, could have any bearing on the case. All testimony offered to show that deceased was intoxicated on the day of the difficulty was admitted in evidence. And we may here add that it was also immaterial whether deceased was drunk or drinking on Monday or Tuesday prior to the killing late Wednesday afternoon. If he was drinking on those days it was not offered to show, nor is it claimed he saw appellant on those days or made any remark to or concerning him or it was in any way connected with the difficulty. It was permissible to show his condition at the time of the homicide, and immediately preceding it, but it was not permissible to go back and cover a period of time when he and appellant were not together, and such evidence could have no legitimate place in the testimony.

The State also introduced what is termed the dying declaration of deceased. It reads as follows:

Vol. 70 Crim.-26.

"My name is C. M. Davis. S. P. Ward is my father-in-law. Yesterday, September 6th, 1911, while I was riding down the road through a cotton field, Mr. S. P. Ward stopped me in the road and said, 'God damn you, do you claim that I owe you $44?' I said 'Yes.' He immediately made a lunge at me, and cut me with a knife. I then reached for my knife, which was unopened in my hip pocket. I got my knife out and just started to open it when said Ward cut me again. I dropped my knife unopened, and spurred my horse, and got away. I make this statement voluntarily, and while I am of sound mind.

        (Signed)  "C. M. Davis."

Witnesses:
  S. H. Burnett,
  J. R. Covington.

This statement was written by Mr. Wilkerson, assistant county attorney, and he says everything deceased said was placed in the statement except an answer made by deceased to a question by Mr. Hamilton as to whether or not he had had a previous difficulty with appellant. The answer to this question was not placed in the dying declaration. It appears from the testimony of Mr. Wilkerson and County Attorney Hamilton that the deceased made the statement above without any interruption, and the same was not in answer to questions propounded, and there is no testimony that it was made under other circumstances or conditions. However, if questions had been propounded, unless they were such questions as would lead to or suggest certain answers to be made, such fact would not render the testimony inadmissible. To render the declarations inadmissible it would be necessary for it to appear that interrogatories were propounded calculated to lead the deceased to make a particular statement. Brande v. State, 45 S. W. Rep., 17; Taylor v. State, 38 Texas Crim. Rep., 552; Hunnicutt v. State, 18 Texas Crim. App., 498; White v. State, 30 Texas Crim. App., 652. There was no testimony that the dying declarations were not made freely and voluntarily, except the questions propounded by appellant to the witnesses, yet the court instructed the jury:

"You are instructed that you will not consider the dying declaration of C. M. Davis, unless you believe from the evidence in this case, that at the time said declaration was made the deceased was of sane mind, and was conscious of approaching death, and that said statement was made voluntarily and not in response to questions calculated to lead deceased to make any particular statement.

"In this connection you are also instructed that it would be no legal objection to said declaration that questions were asked deceased directing his mind to the subject upon which declaration was made. Nor do such questions take from said declaration its voluntary character. On the other hand, you are instructed that if you have a reasonable doubt whether deceased was of sane mind, or whether he was conscious of approaching death, or whether said declaration was voluntarily made

and not in response to questions calculated to lead deceased to make a particular statement, you will not consider said dying declaration for any purpose."

Appellant complains of this portion of the charge on the ground that following the words, "was conscious of approaching death," that the court should have also stated and required the jury to find, "that deceased had no hope of recovery." These words are in the statute, and it would have been proper for the court to so have instructed the jury, and if there was any evidence in the record that deceased had any hope of recovery at the time the statement was made the error might have been hurtful and harmful to defendant. But as we read this record it excludes the idea that deceased at the time the statement was made had any hope of recovery. At the time he was carried from his home to the sanitarium he told his mother good-bye and stated to her to take a good look at him as she would never see him alive again. His sister, Mrs. Less Grayson, testified that just a short time before the statement was made deceased asked for water, and when told that he could not have it—it was not good for him—deceased replied, "It did not make any difference, he was going to die anyway." She testified that deceased never at any time after being cut expressed any hope of getting well.

Neal Davis testified that he was a brother of deceased, and that deceased at no time after he was cut expressed any hope of getting well. He always seemed to think he was going to die. That his brother (deceased) asked for water, and when refused, stated, "Well, you just as well give me all the water I want, I am going to die anyway." That deceased then asked him to pray for him, and in about fifteen or twenty minutes thereafter the above statement was made.

Dr. Hamilton states that he advised deceased he was going to die. That deceased then called his brother John and told him, "I want you boys to look after Lou (his wife) when I am gone." That it was only a few minutes after this when the statement was made to the county attorney and his deputy, hereinbefore copied. The testimony of other witnesses could be stated wherein it was made apparent that deceased appreciated the fact and knew he was going to die, and that at the time the statement was made he had no hope of recovery. There is not in the whole record one suggestion, nor the statement of any witness that deceased at this time entertained any hope of recovery, therefore the omission in the charge could not have resulted in any injury to the defendant. None of the bills objecting to the admissibility of this statement, the testimony going to show whether or not it should have been admitted, the charge of the court presenting this issue, nor the refusal of the court to give the special charge requested in regard thereto, present any reversible error. Under similar circumstances it was held by this court in Taylor v. State, 38 Texas Crim. Rep., 552, 43 S. W. Rep., 1019.

When the case was called for trial the appellant requested that Neal

Davis be placed under the rule with the witnesses. At this time Mr. Davis had not been summoned as a witness, and the court refused the request. The defendant then had a subpoena issued and served on Mr. Davis, and renewed the request. The prosecuting officers stated to the court that Neal Davis was a brother of the deceased, was familiar with all the facts in the case, and they needed and desired his assistance in the trial of the case. The court granted the request and excused the witness from the rule. Appellant complains of this matter, and while in his bill he states that after having him summoned as a witness he did not place him on the stand, but says he would have done so and interrogated him in regard to the weapons owned by his deceased brother if he had not been excused from the rule and permitted to remain in the court-room. The court in approving the bill states: "The State asked that this witness be excused from the rule, and be permitted to remain in the court-room to aid and assist State's counsel in presenting the testimony of the State in the case, it being then represented to the court in open court by State's counsel that they thought it was necessary to have witness present with them, to assist them in drawing out the testimony for the State, said witness being entirely familiar with the testimony of all the witnesses in the case." The court is clothed with a wide discretion by our statute in these matters, and we would not be authorized to criticise his action unless the record before us should disclose that he had abused this discretion and acted arbitrarily. Neal Davis was not a witness to the homicide, and testified to no fact in regard to the way the killing occurred. It is true he testified to facts rendering the dying declaration admissible, and identified the clothing of deceased and similar matters. But as the State's counsel stated that he was familiar with the facts, and could be of material aid to them in a proper presentation of the case, and the court excused the witness for this reason, we can not say he acted improperly. The defendant's counsel always have the defendant with them, and if the State desires one equally familiar with the circumstances to aid them in the examination of witnesses, we can see no impropriety in permitting it. Of course, if it should appear that it was but an arbitrary exercise of the discretion and it was only desired that the witness might hear the testimony before being called to testify, a different rule would prevail. But no such circumstances are disclosed by this record, and under the evidence in this case the court did not err in permitting the State to have the assistance of this witness and in excusing him from the rule. He was instructed and not permitted to talk to any other witness nor any other person about the case during the trial other than counsel in the case. When this witness was placed on the stand he was rigidly cross-examined by appellant, and made to state what assistance, if any, he had rendered the State, and defendant by his examination endeavored to show that he was permitted to remain in the court-room solely for the purpose of hearing the evidence before testifying; his interest and bias in the case was developed, etc., when

the court permitted him to testify that while he was interested in the case, he did not feel sufficient interest to testify falsely. The court in approving the bill qualifies it, and under this qualification the court did not err. One can not assail a witness and expect the court to prevent the witness from stating matters that will enable the jury to determine whether or not he is worthy of credit.

Mrs. M. E. Ward, the wife of appellant, was introduced by him as a witness, and testified to material facts in his behalf; among other things, testified she witnessed the fatal encounter, and saw the deceased strike at her husband before he cut him. In bills Nos. 12 and 76 it is complained that upon cross-examination she was compelled to testify: "(1) That within a few minutes after the difficulty with deceased the defendant went to the well after a bucket of water and carried it back to the house; (2) that immediately after the difficulty she saw the wife of deceased running towards deceased at the point of the lane northwest of defendant's house; (3) that she did not go to the home of deceased and inquire as to his injuries, and did not inquire about his injuries, and did not go to his home before he died, and that she did not go to the funeral; that appellant did not go to see deceased after he was injured; (4) that her husband owned but one knife, and compelled her to describe it as best she could; that she had not been examined about these matters on her direct examination." In approving the bill the court states:

"Mrs. M. E. Ward, the wife of the defendant, was voluntarily placed upon the stand by the defendant. Neither she, nor the defendant, nor his counsel, at any time, made any objection to said witness answering any question propounded to her by the State, except that defendant's counsel, only one time, objected to the query as to whether or not she went to the funeral of the deceased, and assigned as the reason for said objection that the testimony was irrelevant and immaterial. This objection was overruled by the court on the theory that it was legitimate cross-examination, going to the question of the state of feelings of the witness, and the bias or not of her testimony. I repeat that neither the witness, the defendant, nor defendant's counsel, at any time, made any other objection of any character; but the entire cross-examination of defendant's wife was without the slightest objection from anybody; and no question as to said cross-examination was ever made or intimated until defendant's motion for a new trial was filed.

"The court did not 'permit State's counsel to compel defendant's wife to testify to new matters against the defendant,' as alleged in the bill of exception; because (a) all answers were voluntarily made by said witness without objection from anybody; (b) several other witnesses had theretofore, and did thereafter, testify to the same facts with some minor differences in words and detail, and the defendant himself testified to almost exactly the same facts about which his wife was interrogated." It is thus seen that on the trial no objection was urged to the cross-examination of Mrs. Ward except as to one question, and that

was whether or not she attended the funeral. This witness had testified on direct examination that deceased was hers and appellant's son-in-law; to the friendly relations existing between them, and the whole of her testimony was such as tended to prove that if the killing did not occur as contended by her and her husband (appellant), that is, that deceased came there, cursed her husband and told him he (deceased) was going to kill him, and attempted to do so—she knew of no reason why it should have occurred. Under such circumstances, where she was contending that the killing was a sudden affair, with no cause existing theretofore for it, and to the most friendly feelings existing, her son-in-law living near, it would have been the most natural thing in the world for her to have inquired about his condition, gone to see him, or, at least, attended the funeral of her daughter's husband, and her failure to do these things without any excuse would tend strongly to show whether or not her feelings, and the feelings existing between her husband and deceased, were as stated by her on direct examination, and was permissible. The interest, bias, feeling, etc., of the wife, when introduced as a witness, may be shown on cross-examination the same as any other witness. As to the other complaints in this bill, the record discloses there was no objection made on the trial to the testimony, and the first complaint ever made to such matters was made in the motion for new trial after verdict. In our opinion, this came too late. It is true, in the case of Brock v. State, 44 Texas Crim. Rep., 335, 71 S. W. Rep., 20, this court held that it would be error to introduce the wife as a witness against her husband even though not objected to. In some subsequent decisions this case has been referred to approvingly, while in others it has been to some extent criticised. But in this case the question in the Brock case does not arise. In this case the appellant introduced his wife as a witness. She testified to material facts in his behalf, and certainly she was subject to cross-examination the same as any other witness on any matter about which she testified on direct examination under all of our decisions. We think a careful analysis of her testimony would show that the cross-examination was germane to her direct examination. But be that as it may, none of our decisions have gone to the extent of extending the rule announced in the Brock case, supra, that where one on trial has introduced his wife as a witness he can sit quietly by while she is being cross-examined, offer no objection to the cross-examination, make no motion to exclude the testimony adduced on cross-examination until the conclusion of the trial; take chances on securing an acquittal with that testimony in the record, and, in case he should be convicted, in the motion for new trial for the first time complain of the matter, and ask that the verdict be set aside on the ground that the State, in cross-examination of the wife, had slightly overstepped the bounds of legitimate cross-examination. This would be trifling with the courts of our country, and can not and will not be tolerated. Under all of our decisions (except in the instance where the wife was not placed on the stand by her husband, and was first

introduced by the State, as in the Brock case, and this was placed on the ground that it was statutory) it has always been held that where testimony is admitted without objection, and no motion was made to exclude it, no matter how erroneous it was in admitting it, it will not present ground for a new trial, nor reversal of the case on appeal. And while not passing on the Brock case, except in so far as to limit it to the rule there announced, we decline to make any further exception to the well known rule of law, that to the introduction of testimony an objection must be made during the trial, and if this is not done, the matter will not be reviewed after verdict, and such error in the introduction of testimony, if error there be, will present no ground for a new trial. It has always been the rule in this court that a party can not be heard to complain of illegal and incompetent evidence to which he did not object and except to at the time of its introduction, and which he made no motion to exclude during the trial of the case. Wright v. State, 35 Texas Crim. Rep., 367; Gonzalez v. State, 30 Texas Crim. App., 203; Simon v. State, 31 Texas Crim. Rep., 186; Newman v. State, 32 Texas Crim. Rep., 92; Logan v. State, 36 Texas Crim. Rep., 1; Lega v. State, 36 Texas Crim. Rep., 38; Cummings v. State, 36 Texas Crim. Rep., 256; Wagner v. State, 35 Texas Crim. Rep., 255; Jones v. State, 33 Texas Crim. Rep., 7; Herchenbach v. State, 34 Texas Crim. Rep., 122; Smith v. State, 34 Texas Crim. Rep., 123; Schurzer v. State, 34 Texas Crim. Rep., 276; Kutch v. State, 32 Texas Crim. Rep., 184; Wilks v. State, 27 Texas Crim. App., 381; Roe v. State, 25 Texas Crim. App., 33; Williams v. State, 19 Texas Crim. App., 276; Conner v. State, 17 Texas Crim. App., 1; Branch v. State, 15 Texas Crim. App., 96; Cavitt v. State, 15 Texas Crim. App., 190; White v. State, 11 Texas Crim. App., 38; Gaitan v. State, 11 Texas Crim. App., 544; Etheridge v. State, 8 Texas Crim. App., 133; Hatch v. State, 6 Texas Crim. App., 384; Marshall v. State, 5 Texas Crim. App., 273; McDaniel v. State, 5 Texas Crim. App., 475; Alderson v. State, 2 Texas Crim. App., 10; Brown v. State, 2 Texas Crim. App., 115; Glover v. State, 46 S. W. Rep., 824; Martinez v. State, 39 Texas Crim. Rep., 479; Hart v. State, 44 S. W. Rep., 1105; Bridges v. State, 44 S. W. Rep., 500; Wartelsky v. State, 43 S. W. Rep., 991; Halloway v. State, 43 S. W. Rep., 103; Kearly v. State, 43 S. W. Rep., 990.

While the defendant was testifying in his own behalf a knife was exhibited to him, and he stated that was his knife, and the knife with which he cut deceased. This knife by actual measurements was eight and seven-eighths inches long, with blade open, the handle being four and seven-eighths inches long and the blade three and seven-eighths inches long, and the blade at its widest point half an inch wide, and runs to a point. On cross-examination he stated that this was the only knife he owned, but admitted that a short time before the homicide the wife of deceased had delivered to him another knife, which had been found at the barn. He denied, however, telling his daughter that it was his knife, but says he told her it was Morgan's (deceased's) knife. He

admits keeping it, and says he carried it home and placed it on the mantel, and that it was at home on the day of the homicide, and he did not use it in cutting Morgan Davis, deceased. In rebuttal the State was permitted to prove by Mrs. Capeheart that about a week or ten days before the dufficulty she found this knife at the barn and gave it to Mrs. Morgan Davis; that she was present when Mrs. Davis delivered the knife to her father (appellant), and that appellant then claimed the knife as his own. Mrs. Davis testified also that she gave the knife to appellant and he took it and claimed it as his own. Other testimony along this line was admitted. This knife was found at appellant's home after the homicide, and it was introduced in evidence, and is thus described: The entire length of the knife is eight inches; entire length of blade from point to handle is three and one-half inches; from hilt to point of the blade is three and three-sixteenths inches; entire length of handle is four and one-half inches. The blade is five-sixteenths of an inch wide at the hilt; about half way out toward the point the blade is five-eighths of an inch wide, and it tapers from there to a point for a distance of an inch and a half. In regard to this knife, Wm. Johnson testified he owned the knife, and had lost it at the point where it was found about three weeks before the homicide. That at the time he lost it, and the way it appeared at the trial were the following differences: When lost the handle was not broken, and the cross-marks were not on it; it had never been sharpened on a whetstone, as it now appears to have been; the gaps that now appear in the blade were not in the blade when he lost the knife. As before stated, this witness is corroborated by Mrs. Davis and Mrs. Capeheart, only they state when the knife was found appellant claimed it, and it is proven beyond question that this knife was in appellant's possession from the time it was found near the barn until it was found in his residence after his arrest for committing the homicide. The evidence would indicate that it had been sharpened while in appellant's possession, and this was indicative of a preparation for something after the quarrel about the cows and their being turned out by him, etc. The gaps and broken handle also indicate that this knife had been used in cutting deceased, for when deceased was disemboweled his watch chain was cut in two, and a portion of the links driven in the gapping wound, these links being taken out by the doctor in dressing the wound. And while there was but one cut of the outside membranes—a long, deep cut across the bowels, yet the attending physicians say that inside the wound the intestines and the abdominal muscles all indicated that two cuts had been made. Thus while the knife was plunged into the body but once, making one outside cut, yet while it was inside of his abdomen another cut was made with the knife. All this testimony was admissible, and the court did not err in so holding. It may, as contended, have had a tendency to inflame the jury, yet appellant was contending that neither of the knives above described was per se a deadly weapon, and that the circumstances attending the killing did not indi-

cate a specific intention to kill, and, therefore, the court should have submitted the issues of aggravated assault and simple assault in his charge. While it is true that article 1147, Revised Penal Code, provides that the instrument or means used must be taken into consideration in judging the intent of a party slaying another, and if the instrument be one not likely to produce death, it will not be presumed that death was designed, unless from the manner of its use such intention evidently appears, yet article 1150, Revised Penal Code, also provides that if the circumstances attending the homicide show that it was the design of such person to kill, he is deemed guilty of murder or manslaughter, according to the evidence adduced on the trial, even though the instrument or means used in their nature be not such as to produce death ordinarily. In this case it is shown beyond peradventure of a doubt that a knife eight and one-half inches or eight inches long was used in making the assault, and if the knife was used, the State contends it is shown that it had been sharpened while in appellant's possession but a short time before the homicide; that in striking it was used with such force as to sever a watch chain, gap the knife, and drive a portion of the chain into the cavity, and no matter which knife was used, after inflicting one wound which the doctor says "began half way between the navel and the pit of the stomach, running to the left about six inches, straight across the abdomen until it struck the ribs, cutting off two of them at the cartilage, then deflecting and going downward an inch and a half or two inches," and while the knife was in this wound, without withdrawing it, inflicted a second cut or wound inside the bowels, and if this does not indicate a design to kill, we do not know what it would indicate. The circumstances attending this killing, the wounds inflicted, the place they were inflicted, and the way they were inflicted with a knife of the character and kind used, no matter which one of the two was used, certainly would show a design to kill, even if the instrument used should not be held to be per se a deadly weapon, and the court did not err in refusing to charge on aggravated assault nor simple assault. If the knife was used, which the State contended, it shows preparation, and in such event, even the issue of manslaughter would not be in the case. However, the court charged on manslaughter in a way that is not criticised by appellant.

It is contended by appellant that if the court did not err in refusing to charge on aggravated assault, then the court committed error in not instructing the jury in regard to the provisions of article 1106, Revised Penal Code, that if deceased was attempting to use a deadly weapon, then the law presumed that deceased intended to inflict on appellant serious bodily injury. Appellant testified that when they met deceased cursed him and told him he had come to kill him, drew his knife and struck at him twice with the knife before he, appellant, committed any overt act. The blade of deceased's knife, which was found on the ground, is shown to be a large sized pocket-knife, the blade being two and three-eighths inches in length, and at the hilt one-half inch in width.

This knife shows also to have been recently sharpened. Appellant offered to prove by Dr. I. N. Suttle, after stating the circumstances as testified to by defendant, that the knife of the character and kind shown to have been in the possession of deceased was a deadly weapon, and one likely to produce death in the manner used by defendant. The bill shows that Dr. Suttle was asked to testify as an expert on the basis of a hypothetical question propounded. We hardly think it a question of expert opinion whether or not a knife was or was not a deadly weapon. Of course, a physician would know whether or not an instrument is one calculated and likely to produce death when shown the way it was attempted to be used, but what he has been taught in studying to be a physician would not enable him to judge of that more than any other man when no wound was inflicted. All men know that death can be and has been often inflicted with an ordinary knife. This is a matter of common knowledge, and it is not a matter for experts to testify in regard to. In this case the deceased inflicted no wound on appellant of any character or nature. He testifies that deceased struck at him twice with a large sized pocket-knife, but not of the kind that would be per se a deadly weapon. However, we think if a proper question had been propounded the witness should have been permitted to state that it was such an instrument that death or serious bodily injury could have been inflicted with it, and we might further say that the court should have also instructed the jury that if from the evidence they believed or had a reasonable doubt of that fact, that deceased struck at appellant with a knife, and the knife from the mode and manner of its use was an instrument calculated to produce death or serious bodily injury, then the law presumed that deceased intended to inflict such injury. But no certain words are required to be used in presenting this presumption of law to the jury, and if the substance and effect of it is given in the charge to the jury, and it is made applicable to the case, it will be sufficient. In this case the sole evidence that deceased attempted to use a deadly weapon is the testimony which tends to show that deceased told appellant he had come to kill him, and then reached in his pocket as if attempting to draw a pistol or knife, and struck at appellant twice with a knife. Of course, this is disputed by the State's evidence, but we are now passing on whether or not the court sufficiently presented defendant's theory, and the presumption of law arising from the use of the knife described. Among other things the court instructed the jury: "You are further instructed that if at the time defendant cut and stabbed deceased, C. M. Davis, if he did do so, deceased was then attempting to draw a knife or pistol, or to open a knife for the purpose of making an assault upon defendant, or was cutting at him with a knife, or if defendant believed that deceased was doing this, then the defendant had the right to cut or stab deceased in defense of himself against this threatened attack, whether or not the knife was opened or closed in fact at the time. And if you so believe, or have a reasonable doubt thereof, you will find the defend-

ant not guilty." In what more vigorous language could the court clothe the presumption of law arising from the use or attempted use of the knife? This was a direct application of the law to the evidence. He had told them prior thereto if it reasonably appeared to appellant from the acts or words of C. M. Davis that he was making or about to make an assault on him, this would authorize appellant to slay deceased. But as there are some other criticisms of the charge on self-defense, we will herein copy that portion of the charge in full:

"Every person is permitted by law to defend himself against an unlawful attack, reasonably or apparently threatening injury to his person, and is justified in using all necessary and reasonable force to defend himself, but no more than the circumstances viewed from defendant's standpoint at the time his acts indicate to him to be necessary.

"Homicide, the taking of human life, is justified by law, when done in defense of one's person against any unlawful or violent attack, real or apparent, made in such manner as to produce a reasonable expectation or fear of death or serious bodily injury.

(24) "A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable apprehension of danger as it appeared to him from his standpoint at the time he acted.

"And in such event the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant.

"In this connection you are further instructed that the law does not require that the danger to defendant shall be real or actual before he is authorized to act in his own defense. If from the acts or words of C. M. Davis, before and at the time of the cutting, it reasonably appeared to defendant, viewed from his standpoint at that time, that C. M. Davis was making or was about to make an assault upon him, this would authorize the defendant to cut and stab the deceased, and to continue to do so as long as defendant believed he was in danger.

"In determining the question of apparent danger, it is your duty to put yourselves in the position of the defendant, and view the evidence and facts and acts of deceased from his standpoint just before and at the time of the cutting.

(26) "Now, although you may believe from the evidence that S. P. Ward with a knife cut and stabbed and thereby killed C. M. Davis, yet, you further believe that at the time of so doing the defendant believed that C. M. Davis had made or was about to make an unlawful attack upon him, which from the manner of it, and the defendant's knowledge of the character and disposition of the deceased, and from the words and acts of C. M. Davis, if any, caused defendant to have a reasonable expectation or fear of death or of some serious bodily injury, and you further believe that acting under such reasonable expectation or fear, the defendant cut and stabbed and killed C. M.

Davis; then, if you so believe, or if you have a reasonable doubt thereof, you will acquit the defendant.

"In this connection you are instructed that the fact that the deceased was the son-in-law of defendant, would not impair defendant's right of self-defense.

"You are further instructed that if at the time defendant cut and stabbed deceased, C. M. Davis, if he did so, deceased was then attempting to draw a pistol or knife or to open a knife for the purpose of making an assault upon defendant or was cutting at him with a knife, or if defendant believed that deceased was doing this, then defendant had the right to cut or stab deceased in defense of himself against this threatened attack whether or not the knife was open or closed in fact at that time.

"And if you so believe, or if you have a reasonable doubt thereof, you will find the defendant not guilty."

One of appellant's contentions is that the court, in paragraph 24 of the charge, in defining self-defense used the words, "great bodily injury," instead of "serious bodily injury," yet when he comes to apply the law in paragraph 26 he uses the words appellant insists he should have used, "serious bodily injury." By turning to standard dictionaries it will be found that the word "serious" is thus defined: "Important; weighty; not trifling; in a grave or alarming degree or manner so as to give ground for apprehension." Turn then to the meaning of the word "great," and as applicable here, the two words, in substance, mean the same thing. There could be no serious injury in fact unless it was a great injury. No trifling injury would be termed serious. So it will be seen that this criticism is in the highest sense hypercritical had the word been used in applying the law, but it is not there used, but the term appellant contends for is the one used.

There is another criticism of this charge,—to the first paragraph thereof wherein in defining self-defense, among other things, the court says: "Every person is permitted by law to defend himself against an unlawful attack, reasonably or apparently threatening injury to his person, and is justified in using all necessary and reasonable force to defend himself, but no more than the circumstances viewed from defendant's standpoint at the time the acts indicate to him to be necessary." As an abstract proposition this is a correct enunciation of the law of self-defense, but it is to be regretted that the courts will not use more judgment and discrimination and present the law as applicable to the evidence in the instant case, and not give general definitions. In a proper case where the question of more force than is necessary arises in the case, this would be a proper definition. But if A shoots at B with a pistol and B uses a cannon and blows A into a thousand fragments, the question of more force than is necessary would not arise in the case,—it was permissible for him to use whatever means was at hand to protect and preserve his own life. And the words "but no more force than the circumstances indicate to him to be necessary"

should not be used in the definition, unless that is an issue in the case, and later on the court intends, in applying the law to the case, to submit properly the use of more force than is necessary. In this case the question of the use of more force than was necessary is not in the case. If appellant's contention is correct, and deceased was attempting to use a knife on him, after informing him that he had come to kill him, he would have the right to cut and cut to kill, and if in applying the law to the case and submitting the issue, the court had submitted the issue of the use of more force than was necessary, the charge would present error. But this he did not do, and in submitting the issue of self-defense the jury was not required to find nor inquire into whether or not more force than was necessary was used, but they were specifically told if the deceased was attempting to cut appellant, or it reasonably so appeared to him to acquit. In addition to the charge hereinbefore copied applying the law of self-defense, the court, at the request of appellant, also instructed the jury:

"You are further instructed that if the deceased, Davis, when he met the defendant in the road said to the defendant, 'God damn you, I have come down here to kill you,' and if you believe that the defendant thought that such threat was seriously made by the deceased, and if you believe that at the time or immediately after any such threat was made, that the deceased was doing anything, from which the defendant from his standpoint could reasonably infer that the deceased, Davis, was about to put into execution and to carry out such threat to kill him, in any manner or by any means, you are charged that the defendant had the right then and there to cut the deceased, Davis, and to continue to cut him until it reasonably appeared to him that he was out of any such danger, and if you believe from all the evidence that the defendant cut and killed the deceased under such circumstances, or if you have a reasonable doubt thereof, you will acquit the defendant and say by your verdict not guilty."

Thus again the court applied the law directly to the evidence as offered in behalf of appellant. However, it is earnestly insisted by appellant that in some cases we have held the definition erroneous and reversed cases because thereof, there being a conflict in the decisions of this State on that question. We are of opinion that if the records of the various cases were examined, the seeming conflict would disappear, and in those cases the court in applying the law to the case (not in its definitions), instructed the jury in regard to the use of more force than was necessary, when it was not an issue in the case, and in the cases where the use of these words was held to be reversible error, the words were not simply used in the definition of the term as in this case, but appeared in that portion of the charge applying the law to the case. We are referred to the cases of Castro v. State, 66 Texas Crim. Rep., 282, 146 S. W. Rep., 553; Antu v. State, 66 Texas Crim. Rep., 329, 147 S. W. Rep., 234, and Mayhew v. State, 65 Texas Crim. Rep., 290, 144 S. W. Rep., 229. In none of these cases is the charge

on self-defense copied, and we have not the records before us, but if in those cases, as contended by appellant, the use of the words, "but no more force than the circumstances indicate to him to be necessary," appeared only in the definition and not in the part of the charge applying the law to the facts of the case, and the court in applying the law to the facts of the case, correctly did so as applicable to the evidence of those cases, then those cases are not the law.

As before stated, we are of opinion in those cases, in applying the law to the facts, the court submitted to the jury the issue of the use of more force than was necessary, or did not correctly apply the law to the facts in those cases in some respect, and it was necessary to reverse the case, and attention was called to this matter and suggestion made that such issue was not in the case, and should be omitted in the next trial of the case. Our presiding judge wrote the opinions in the cases above referred to by appellant, and we are satisfied he never intended such construction as is sought now to be placed thereon should be placed thereon, for in a well considered opinion, in the case of Moss v. State, 60 Texas Crim. Rep., 268, he says, rendering the opinion for the court: "The court gave the following charge: 'Every person is permitted by law to defend himself against any unlawful attack and is justified in using all the necessary force reasonably sufficient to protect himself from death or serious bodily injury, and to use all force apparently reasonably necessary for that purpose, but no more than the circumstances reasonably indicate to be necessary.' (This is an exact copy of the paragraph criticised in this case.) Following this the court gave an admirable charge directly applying the law of self-defense to the facts of the case. This charge is in nowise criticised by appellant. The contention here is that the latter clause in the charge, towit, 'no more force than the circumstances reasonably indicate to be necessary,' is a limitation upon the perfect right of self-defense and was not called for by the facts of this case. This charge is not strictly accurate with reference to a case of perfect self-defense, and if it stood alone would be justly subject to criticism. It is, however, but a general statement of the doctrine of self-defense, and we think in the case in hand, without harm in view of the fact that an accurate charge applying the law to the facts was given. The court nowhere undertook to charge the limitations set out in article 677 of the Penal Code, which justifies homicide in the protection of the person or property against any other unlawful and violent attack besides those mentioned in the previous statutes. The previous statutes refer to the perfect right of self-defense without limitations. The clause in the general definition, criticised by appellant, is not sufficiently erroneous to require a reversal of the judgment." This is the true rule and has been adhered to in every well considered case before and since its rendition. No one contends that it was a proper definition as applicable to the facts in this case, but it is followed, as in the Moss case, with an admirable charge in applying the law to the evidence, and in addition

thereto a special charge still further applying the law to the facts was given at appellant's request.   Again in Kinney v. State, 65 Texas Crim. Rep., 251, 144 S. W. Rep., 257, we held that where this error appeared in the definition, but the court in applying the law correctly did so, it was not ground for reversal.   In the case of Eggleston v. State, 59 Texas Crim. Rep., 542, this rule is again correctly announced.   The writer of this opinion was attorney in that case, and made to some extent the contention that is here now made, and the court when composed of Judges Davidson, Ramsey and McCord reiterated the rule above stated in the Moss case.   Many other cases, almost from the incipiency of this court to the present time could be cited, but we deem it unnecessary, wherein it is held that if in applying the law to the case and in submitting the issues the court correctly does so, some error in the definition which could not have misled the jury would be no ground for reversal of the case, and as stated above, the true rule is correctly announced by Presiding Judge Davidson in the Moss case, supra, in this character of case, and should any of the other cases be held to announce a different rule they are hereby overruled, and this court will in future adhere to the rule announced in the Moss case.   However, trial courts should omit this part of the definition in a case where the use of more force than is necessary is not an issue in the case, and it is only in those cases where they subsequently properly apply the law in submitting the issue it will be held to be harmless error.

There is no strength in the contention that the court did not permit appellant to prove his general reputation as a peaceable, law-abiding citizen in the community where he lived.   The court permitted all witnesses to testify who were offered on that issue, but when Dr. Hamilton answered that he did not know that reputation, his individual opinion was not admissible, and the court did not err in so holding.

The above are about all the matters presented by appellant in his brief and able oral argument before this court, but as he states he does not waive the other matters assigned, we will briefly review some of them, numerous though they be.

In the first bill in the record it is contended that the court erred in not quashing the special venire summoned.   The first ground is that a number of them drawn were not summoned..   The record discloses that when the motion was presented the court heard the matter, conducted an investigation in which appellant's counsel participated, and it was learned that those who had not been summoned were not then in the county.   The next contention was that some of those summoned were not in attendance.   The record discloses that a number of them had served more days than required by law during that term of court; that they asked the court to excuse them from further attendance; he declined, but told them they could leave their excuse with the sheriff, and if he needed them he would send for them.   When appellant's motion was presented, the court had the sheriff to bring in the excuses, submitted them to appellant's counsel, and told them if they insisted on

their attendance he would have them attached and brought in. Appellant's counsel acquiesced and asked for no attachment. It further appears that appellant secured a jury satisfactory to him without exhausting his challenges. The bill presents no error.

There was no bill of exceptions reserved to the action of the court in overruling the motion for continuance, consequently we can not review that question.

It was proper to permit the physicians to describe the wound, depth, course, ligaments, etc., severed. Appellant on cross-examination endeavored to show that where severed the various portions had not been properly sewed; that it was improper to use catgut sutures, etc., and insisted on introducing medical books showing that catgut was not a proper thread, and the death may have been occasioned by this alleged improper treatment. No person was introduced who so testified, it is true, and the books under an unbroken line of decisions were properly excluded, yet the insistence of appellant in propounding these questions and tendering these books as evidence, made it not only permissible but imperative on the State to prove the nature and character of the wounds.

As appellant was contesting the admissibility of the dying declarations, it was permissible for the State to prove that he was sane, conscious of approaching death, and had no hope of recovery. Consequently those bills complaining of the admissibility of testimony going to show these facts present no error.

There was no error in admitting the clothing in evidence. It is true it had been washed and all blood obliterated therefrom, but with this exception they were shown to be in the exact condition as when they were taken off of deceased. The location, nature, length, etc., of the wound or wounds were questioned by appellant, and they, therefore, became admissible. Nor was there any error in permitting it to be shown that the cuts in the top shirt and undershirt corresponded.

As to the testimony of the witness W. H. Yancy, appellant introduced him to prove that deceased came to his home and offered to buy a pistol from him a few days before the homicide. On cross-examination the State was permitted to prove that the occasion for deceased going to Yancy's home was, he was trying to get Yancy to take a trip to East Texas with him, and to prove further that deceased had endeavored to buy this pistol before any falling out had occurred between appellant and deceased. As appellant was seeking to use this circumstance as evidence that deceased was preparing to kill appellant, it was proper for the court to permit the witness to state the real circumstances. Appellant had not heard before the homicide of this offer to buy Yancy's pistol.

As to the witness Mrs. Molly May not being permitted to testify that she saw deceased just before the homicide, and that from his appearance she judged him to be drunk, the court in approving the bill states that this witness had testified to these facts two or three times before he sustained an objection on the ground that it was but a repetition.

The court seems to be borne out by the statement of facts. What she at the time told Mrs. Hammel would be hearsay, and the court did not err in excluding it. She was a witness, and could testify to what she knew and not what she said to a third party.

Appellant placed in evidence the issue of his general reputation as a peaceable, law-abiding citizen, and on cross-examination of these witnesses it developed that some time prior to this difficulty he had had a difficulty with a man named Scherrer. While testifying in his own behalf he was asked, "You broke a couple of Scherrer's ribs, didn't you?" To which the witness answered, "No, sir." This question was improper but as defendant answered, "No," and no proof was offered that he did not speak the truth, no harm could have resulted to appellant.

Mrs. Davis testified that she was picking cotton in a field and saw her father strike or strike at deceased; that deceased was then on his horse and in a few seconds turned and rode away. Appellant offered evidence tending to show that there was a hill between the point where Mrs. Davis was picking cotton and the place where the difficulty occurred, and one could not see the other from the respective positions. The court then permitted the State to introduce witnesses who testified they had had the place pointed out to them where the difficulty occurred by those who knew and at the point where Mrs. Davis was picking cotton and standing on the ground each would be in plain view of the other. In this there was no error.

Charlie Hammel testified for the State that he saw the knife of deceased a few moments after the killing lying on the ground, and it was then closed. Later when picked up it was open, as testified to by defendant's witnesses, making this an issue in the case. Hammel was asked on cross-examination if he did not tell Henry Ward, "Your father thinks I have got it in for him, but I have not. I can't say whether that knife was open or shut." He denied making any such statement to Henry Ward. The defendant then asked him if Henry Ward did not say to him certain things. The court excluded what Henry Ward said. In approving the bill the court states that while excluding what Henry Ward said, he told counsel he would be permitted to ask Hammel in respect to anything what it is claimed Hammel had stated to Ward, but Ward's remarks thereon would be inadmissible. As presented by the bill no error is shown as it does not appear that the statements of Ward would render any more clear the alleged statements of Hammel.

There are a number of other bills of exception, some approved and some not approved by the court. We have read them all, and those approved as qualified by the court present no error. However, there is another matter shown by the record that should be discussed. In one bill it is shown that when the State offered to prove by Mrs. Davis what her husband said to her when she went to him just after being cut, the defendant objected to her stating what he said. The court overruled

the objection, when appellant's counsel stated he would like to know on what ground the court overruled his objection, when the court stated that he admitted it on the ground that it was res gestae of the transaction, not over ten or fifteen minutes having elapsed.  Again it is shown that the defendant sought to prove that deceased was intoxicated on Monday and Tuesday preceding the difficulty on Wednesday afternoon.  The court told counsel he would not permit them to show that fact unless they would undertake in some way to connect it with the difficulty on Wednesday.  When they did not offer to do this, the court informed counsel such testimony would not be admitted.  After the court had so ruled, appellant's counsel continued to ask questions in regard to the matter.  The court then stated to counsel if he asked those questions again he would place him in jail.  It is always to be regretted that such incidents occur, but when the trial court rules that testimony is not admissible, it is proper for counsel to respect that ruling, although they deem it erroneous.  Only in this way can due order be obtained in the court-room.  This court is supposed to correct such erroneous rulings if they are made, and counsel have done their duty by their clients when they offer the testimony, and state to the court the reason why they think it admissible, or object to testimony, and the grounds they think why it is inadmissible, and if the court does not agree with them, reserve a bill of exceptions to such ruling.  Again when the court overruled the objection to the introduction of Mrs. Davis' testimony, it was proper for him to do so without assigning his reasons for so doing as he did at first, but when counsel requested to know why he did do so, if the court stated his reason it is not a matter of which he can be heard to complain.  The record discloses several instances similar to the above, and, as before stated, it is regrettable that such colloquies occur and instances arise where the court feels authorized or impelled to criticise counsel in the conduct of a case, or for counsel to criticise the judge, but reading each and every one of these bills we fail to see how either of the occurrences could have had any influence with the jury in arriving at their verdict.  In none of them did the court say anything which would indicate his opinion of the merits of the case, nor could it be construed as being upon the weight to be given any of the testimony.  It would be well, however, if the court feels constrained to criticise or lecture counsel, to first send the jury out of the room, and then do so plainly and emphatically, and inform them plainly what will be the penalty if they wilfully disobey the rulings of the court, and seek to get before the jury testimony that has been excluded by the court.  When the court excludes testimony it is never proper for counsel to state in the presence and hearing of the jury what the testimony of the witness would be were he permitted to testify.

As stated before, the main issue in the trial of this case was, and it was closely contested, whether or not appellant was justified in his action. This issue was fully and fairly presented as shown by the excerpts from

the charge hereinbefore copied, and the jury found against this contention. The issue of manslaughter is submitted in a manner not complained of by appellant. The charge of the court on murder in the second degree has been frequently approved by this court, and while there are some immaterial errors as hereinbefore pointed out, yet there were no errors that could or would have been hurtful or injurious to appellant as bearing on his plea of self-defense, and if this is not found to be true, the punishment assessed is none too severe. Some of the special charges requested were given, and the others in so far as they are the law of this case were fully covered by the court in his main charge.

The judgment is affirmed.

*Affirmed.*

[Rehearing denied June 27, 1913.—Reporter.]