## , W. A. (ANDY) SHAMBLIN v. THE STATE.

### No. 3312. Decided December 2, 1914.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence was sufficient to sustain the conviction, although conflicting, there was no reversible error.

**2.—Same—Evidence—Res Gestae Statements—Examination of Witness by Judge.**

Where, upon trial of murder, the record showed that the trial judge questioned the witness to determine whether her testimony gave the res gestae statement of the deceased, and it appeared that it was manifest that said statement was a statement of the facts within the knowledge of the deceased, and that he was placed in such juxtaposition to the defendant that he could have known who shot him, there was no error in admitting his declarations made about two minutes after the shooting that the defendant did it, and there was no error in such examination of the witness.

**3.—Same—Rule Stated—Res Gestae.**

It is indispensable to a correct understanding of every transaction that every act attending it, verbal as well as physical, by whomsoever it may be committed, be placed before the court for its enlightenment. This rule as to res gestae overrides all other rules known to the law governing the admissibility of testimony. Following Cook v. State, 22 Texas Crim. App., 511, and other cases.

**4.—Same—Rule Stated—Opinion of Witness.**

The fact that the statement is wholly or partially the opinion or conclusion of the declarant does not of necessity render it inadmissible, if it is a part of the res gestae; especially, if the statement, though on its face might be a conclusion, is made as a statement of fact. Following Rainer v. State, 67 Texas Crim. Rep., 87, and other cases.

**5.—Same—Sentence—Reform of—Indeterminate Sentence.**

Where, upon trial of murder, the sentence of the court was for a specific number of years, as found by the verdict of the jury, the judgment will here be reformed in accordance with the indeterminate sentence law.

Appeal from the District Court of Limestone. Tried below before the Hon. H. B. Daviss.

Appeal from a conviction of murder; penalty, ten years imprisonment in the penitentiary.

The opinion states the case.

*A. B. Rennolds* and *Wm. Kennedy* and *W. T. Jackson*, for appellant.— On question of insufficiency of the evidence: Warren v. State, 52 Texas Crim. Rep., 218, 106 S. W. Rep., 132; Johnson v. State, 52 Texas Crim. Rep., 510, 107 S. W. Rep., 845; Clifton v. State, 47 S. W. Rep., 642; Williams v. State, 70 Texas Crim. Rep., 275, 156 S. W. Rep., 938.

On question of admitting statement of deceased: Green v. State, 62 Texas Crim. Rep., 345, 137 S. W. Rep., 126; Bateson v. State, 80 S. W. Rep., 88; Medina v. State, 63 S. W. Rep., 331.

On question of asking leading questions: Hysaw v. State, 69 Texas Crim. Rep., 562, 155 S. W. Rep., 941.

On question of indeterminate sentence law: Simmons v. State, 73

Texas Crim. Rep., 288, 164 S. W. Rep., 843; Fate v. State, 73 Texas Crim. Rep., 278, 164 S. W. Rep., 1018; Cole v. State, 73 Texas Crim. Rep., 457, 165 S. W. Rep., 823.

*C. E. Lane*, Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was convicted of murder and his punishment assessed at ten years in the penitentiary.

Appellant earnestly contends that the evidence is insufficient to sustain the conviction. This presents the most serious question. The statement of facts embraces 124 typewritten pages. Of course we could not undertake to give in detail all the evidence shown by this statement. In passing on this question we will give succinctly the substance of facts which the evidence was sufficient to establish, not undertaking, except in special instances, to give the specific testimony of any witness.

The deceased, Ben Wells, was about 57 years old. He had lived in the immediate neighborhood, and on the place where he was killed together, some fifty years. He had been married three times. When killed he was living with his third wife. He had two daughters by a former wife. One of them, Lily, had married appellant some three years before the killing. Another, Alice, an unmarried young lady 17 or 18 years of age, was living with him as well as his then wife and some of their small children. Deceased was assassinated on Sunday night, December 28, 1913, about or just before 7 o'clock, while he was sitting in his home at his fireside with his family. The fatal shot was fired by the assassin through a glass window near which deceased was sitting with his back quartering from it. The assassin was shown to have stood on tiptoe very near to the window, and the gun must have been almost against it, for the wadding from the cartridge and some of the glass from the window pane, with the shot, entered the back of deceased just to the left of the backbone, tearing away the left side of the back bone and almost severing it. Instantly upon the shot being fired, deceased put his head against the window facing of the window through which the shot was fired. Deceased sat close to the window. A lamp was in the room where the light from it shone through said window. The position of deceased at the time he was shot and instantly thereafter was such that the jury and lower court could conclude that he could have seen, and did see, the assassin through the window. Immediately after the gun was fired the assassin fled in the dark of the night. Deceased's wife immediately sprang to him. He said, "Oh! mamma," repeating it several times. She then ran to the door and screamed three times. Then went back to him and someone in the room said to telephone for a doctor. She rang the phone and called Jim Wells over it, deceased's brother, told him someone had shot deceased and to phone for a doctor to come quick. She then went to her husband, who then said, "Andy Shamblin done this." Jim Wells at once called the doctor over the phone and he himself at once went to deceased. He lived near him. It was only about two minutes from

the time the shot was fired until deceased said to his wife, "Andy Shamblin done this." It could have been but a very few minutes after the shot was fired before Jim Wells reached his brother. Jim Wells asked him, "Ben, who did this?" He said, "Andy Shamblin." Jim Wells asked him, "Can't you be mistaken?" and he said, "No, it was Andy Shamblin." Deceased died from the effects of the shot a few hours thereafter. "Andy" Shamblin is appellant.

Some year or two before the killing, appellant had bought from deceased a small piece of land, only some half mile from deceased. Appellant got mad at deceased about the execution and acknowledgment of the deed to him. Appellant lived on this place purchased from deceased only a short time. During this time deceased, from what he saw and heard, came to the conclusion that the appellant was unduly infatuated with, and that an undue intimacy existed between appellant and his said young daughter, Alice. Deceased thereupon became incensed towards appellant because thereof. For about a year or more before the killing, deceased did what he could to prevent Alice and appellant from associating together, or being together. He forbade appellant on that account coming to his home. He also forbade Alice going to appellant's home and tried to enforce his directions in these particulars. Something like a year or perhaps less before the killing, appellant and deceased talked over this matter and there was then somewhat of a reconciliation between them. This did not last long for appellant, in his cross-examination of Jim Wells, established that while there was a kind of reconciliation between them, the deceased thereafter became more convinced of the improper relations between appellant and Alice than he had been before, Jim Wells stating that deceased said, "that after Andy promised to do it no more it only grew worse"; that deceased also talked to his daughter Alice about it several times and he saw that he couldn't stop it and "it only grew worse, and then he forbade Andy coming to his house." Alice also testified that her father had accused her of this, and that she told appellant thereof. It was also shown that deceased's wife talked to appellant and told him the young people over the country were talking about it,—the relationship between him and Alice, and that the deceased didn't want anybody talking about his daughter; that she also talked to Alice about the relationship and talk over the neighborhood between Alice and appellant; that when she talked to Alice about it and was telling her what it would lead to she said Alice got mad, "and said it was none of mine and her papa's business what she did." It was also unquestionably shown that the deceased concluded, because he could not break up what he claimed was the relationship between Alice and appellant, to sell the little farm where he lived and in the community in which he had lived for the last fifty years, and buy a place in Franklin County, 200 miles distant to move to, so as to keep Alice and appellant apart, and break up the relationship between them; that the very next morning after he was killed the night before he was going to move and had made all his arrangements for that purpose, and take Alice with him. Appel-

lant knew all this. From time to time for a year or more before the killing appellant is shown to have made declarations showing his hostility to and some threats against deceased. Particularly about deceased's suspicions and claimed relationship between him and Alice. Just a week or two before the killing deceased sent word to appellant's wife, Lily, by his brother, Jim Wells, that he wanted her to come to see him and spend the day before he removed; that Jim Wells saw appellant at his (Jim Wells') store and told appellant the word deceased had requested him to communicate to Lily and asked appellant if he would not tell Lily so as to save him, Jim Wells, the trip himself to deliver the message; that in that conversation at that time appellant tried to tell him of the trouble between him and deceased and said to Jim Wells, "the more I see of him (deceased) or think of him the more I hate him." There is no question but that the testimony in this case was amply sufficient to show that appellant had the motive to kill deceased and that no other had such motive.

The evidence further shows that for some time prior to the Sunday of the night on which deceased was killed, there had been considerable rain and that the country was muddy and wet. It also showed that it rained that Sunday morning; that the rain ceased about or before noon that day and that it had not rained from that time on for some time and not until after the tracking and other evidence to which we will now call attention. Very soon after the shooting officers who lived several miles away were phoned about it and as soon as they could, went to the scene. They reached deceased before he died. The night of the killing was a very dark night. No attempt was made that night to track the assassin, but early the next morning the officers and others did attempt to track him. They found where he had stood very close to the window on his tiptoes when he fired the shot; that in leaving, his foot slipped at that place, but did not at that immediate place make a track that could be measured and identified. He immediately stepped upon Bermuda grass, and while his tracks made no such impression on the grass that they could be identified and measured, yet, he could be tracked thereby to the yard fence over which he went; that search was made around the whole yard and no other track could be found leaving it except this one from the window. As soon as he got over the yard fence he crossed a place where his tracks could be seen, identified and measured. We will not undertake to give the details of the evidence establishing this tracking and the identity of the tracks. It is sufficient to show that it established that these tracks were identified, measured and showed that they were made after the rain ceased on Sunday between that time and the Monday morning following. It is clear that the party making the tracks went a zigzag route so as to avoid going to or any nearer to the houses of the neighbors than was possible. It was a thickly settled neighborhood. In other words, that he took such a circuitous and zigzag route as would avoid going to every house where he had to pass, and that he went across grass patches and places of that kind as much as possible so as to avoid making distinct tracks,

when he could. That these tracks, however, were traced in this zigzag route from the house of deceased to appellant's or to within twenty steps of appellant's house, there can be no question. When they got within this distance of appellant's house they went across another grass plat where no distinct tracks were made which could be identified. These tracks were measured by the officers. All the testimony shows that a part of the time the tracks showed that the party was running. The other times, walking. The route taken, the objects encountered and then avoided, would lead inevitably to the conclusion that they were made at night and that they must have been made on that Sunday night. It is true that a part of the tracking, from deceased's to appellant's only was found the next morning. The officers, nor others, did not attempt to trace the tracks from deceased's entirely to appellant's at first. Some of the tracks were not discovered till Tuesday morning, and they were not traced all the way until Thursday morning. The testimony also showed that these same tracks were traced from about half way from appellant's to deceased's house, going from the direction of appellant's to deceased's and they were traced practically clear up to deceased's house. The distance on an air line between appellant's and deceased's was shown by actual measurement to be 1.8 miles. The distance traveled in said zigzag manner from deceased's to appellant's was shown by actual measurement to have been 2.59 miles. The witnesses, in testifying on the trial, had before them a map drawn to scale showing these distances and the route taken by these tracks for the distance found, going from towards appellant's to deceased's house and the complete route from deceased's house back to appellant's, and this was all explained and illustrated by the several witnesses in testifying on the trial, very much better than can be shown in any statement of facts. Appellant, at no time, after the killing, went to the home of the deceased. The next morning when the officers went to his home they told him that they knew he was kinfolks of deceased and thought he could tell them something about the killing. They found him and his father together in his lot; that when the officers said this to him his father said, "Yes, I knew what you were up to when I saw you coming," and "I told the children last night that I knew somebody would lay it on Andy." One of the officers then asked appellant where he was at the time of the shooting and he said he was out at the lot getting ready to go and his wife heard it over the telephone. The officers asked him why he didn't go to deceased's and he said he didn't know; that he was at the lot getting ready to go and decided it was best not to go. He said his wife heard it over the telephone while he was getting ready to go. He didn't then tell the officers how he had heard of the killing.

The officers thereupon told appellant that they wanted his gun and ammunition; he went into the house, got his double-barrel shotgun and several cartridges and brought them to the officers. The officer testified that one barrel of the gun had been recently fired. The officers took charge of the gun and of the cartridges. Some of them were produced,

identified and introduced in evidence on the trial. One of them was unloaded on the examining trial of the case and found to be loaded with Lomo buckshot. Nearly half way between deceased's and appellant's house on the route the officers found these tracks, going from deceased's, they also found an empty shotgun shell which was shown not to have been wet or rained· upon. It corresponded exactly with the other shells they got from appellant. The doctor and the officer probed the wound of the deceased immediately after he died and found not only the wadding and a part of the glass of the window in the wound, but also found Lomo buckshot therein, which corresponded exactly with the shot taken out of one of the cartridges delivered by appellant to, the officers. On the morning they arrested appellant they found in his house a pair of his shoes which had fresh mud all over them. They were identified unquestionably as his shoes and were introduced in evidence on the trial. The measurements of the tracks found by the officers and others corresponded with these shoes of appellant. Said tracks were unquestionably shown to have been made by someone who was pigeon-toed. The testimony showed that appellant was pigeon-toed and that no other person in that country was known to be pigeon-toed.

As stated, we have not attempted to give all the testimony nor detail it, except in some instances. Appellant's defense was alibi. The court properly submitted this to the jury and the jury found against him. We have not stated the evidence in various particulars which might tend in some measure to weaken the State's evidence, or the conclusions from it which we have given above. This, as we understand, is not necessary when the insufficiency of the evidence is attacked as not sustaining the verdict. All these matters were for the jury. They passed upon all of them and the question this court determines is whether, from the evidence the jury were justified in finding the verdict they did. The fact that the jury might have been justified in believing appellant's contentions and acquitting him, when the jury had all the evidence before them, can not militate against the verdict when the evidence was sufficient to sustain it. In our opinion the evidence was sufficient to justify the jury to believe that appellant and no other killed the deceased and excluded any reasonable hypothesis that any other killed him. In other words, it met the requisites of circumstantial evidence which was aptly charged by the court. Therefore, we can not disturb the verdict of the jury.

Appellant made no complaint of the charge of the court. He has only four bills of exception. These are about the same subject matter and can be stated together, which we· do. In one it is shown that while Mrs. Wells, deceased's widow, was on the stand she was about to relate the statement made by her husband within about two minutes from the time he was shot, which statement was, "Andy Shamblin done this," to which appellant objected. The trial judge thereupon, for the purpose of satisfying himself whether or not the statement was res gestae, asked the witness, in the presence and hearing of the jury, these questions: "Q. Was there a light in the house? A. Yes, sir; there was a light

setting on the dresser, between him and the wall. Q. Was Mr. Wells setting with his back to the window? A. Yes, sir; kinder sideways. Q. Do you know which way his face was turned when he was shot? A. Yes, sir; toward the east. Q. What direction would that be from the window? Q. Was it from the window or quartering from the window? A. It was quartering from it, when he was shot, his head went against the window facing. Q. What direction was the window from where he was shot? A. North. Q. He dropped his head back? A. Yes, sir. Q. Could you say whether he turned to one side or the other? A. No, sir; I don't think he did. Q. How long after the shot was fired before he made the statement you started to relate? A. Just about two minutes, he said Andy Shamblin done this, and I ran to the telephone and then back to him and he fainted." The court thereupon overruled appellant's objections and permitted the witness to so testify. Appellant's objections were "that said question was leading and said action of the court was calculated to and did lead the jury to believe that the court thought that the deceased saw the person who shot him and was very prejudicial and injurious to his rights." The court, in allowing this bill, qualified it by stating, among other things, as follows: "(1) As shown by the bill itself this questioning of Mrs. Wells was done by me for the purpose of determining the character of testimony, that is, whether it was res gestae or not. (2) From this examination, as well as from all the other evidence relating to the same matter, it is, was and is manifest that the statement of deceased was res gestae evidence; and was admissible as such. It is equally manifest that said statement of deceased was the statement of a fact within the knowledge of deceased, which was res gestae of the transaction. It can not be disputed that the evidence disclosed that, at the time of the shooting deceased was sitting with his back quartering toward the window north, with his face quartering east, with his left eye toward direction from which shot came, that when he was shot he fell with his head against the window facing from which the shot that killed him came. Why might he not have seen who shot him? Who can dispute that he did see? The court had a right to know all this to determine the admissibility of the testimony, and the jury had a right to know it to enable them to judge of the weight of the testimony." In our opinion the questions were not leading and the court, under the circumstances, did not err in asking them; nor could the jury be misled by the court's action as claimed by appellant.

The next bill is to the said evidence of Mrs. Wells that the deceased made the statement to her as shown, "Andy Shamblin done this." His objection to this was that it was deceased's supposition, conclusion and opinion with reference to who shot him, was hearsay and not binding on him.

The next bill is to said testimony of this witness because, in effect, it did not come within the doctrine of a dying statement. It is suffi-

cient as to this to say that it was not offered, nor admitted as such. It was offered and admitted as res gestae.

The next bill shows that while the State's witness J. E. Wells was on the stand he testified, "I asked Ben (deceased) who did this, and he said Andy Shamblin," and "I then asked him, can't you be mistaken? and he said No, it was Andy Shamblin."

In approving these three last bills the court explained and qualified them as follows: "(1)   The testimony referred to in this bill was admissible as res gestae of the transaction. As I view it, in the light of all the other testimony relating to the particular matter, it was the statement of a fact, which was within the knowledge of deceased. (2) Any careful perusal of the statement of facts will convince any candid seeker for the truth of the transaction that deceased might have seen and known who shot him. It is manifest that he could have and I think he did see, by the light which shone out of the window through which he was shot, or by the flash of the gun, in the involuntary and lightning like glance which he could and must have cast in the direction from which shot came, who shot him. His face was quartering from, facing east, the window was north of him, the light shone out that window, the shot came from outside through the window, deceased fell toward with his face on window facing, and his left eye toward this window. See testimony of Mrs. Wells, the wife of deceased, and the only other eyewitness to shooting. (3)  When Jim Wells was on the witness stand testifying, he narrated the statement that deceased told him very shortly after he got to him that defendant, Shamblin, had shot him. Defendant's counsel neither objected to this testimony, nor moved to exclude it. Defendant's counsel vigorously cross-examined Jim Wells, endeavoring to prove a slightly different verbiage to the statement made by deceased. And, as a feature of their defense, defendant's counsel introduced as their witnesses and offered the testimony of Miss Lily (Alice) Wells (daughter of deceased), Tom Flemming, and others, and proved slightly different statements made to them by deceased from those statements made by deceased to Mrs. Wells and to Jim Wells, but all to the same effect, towit: That defendant shot him, all which will be seen by perusal of statements of facts. (4)   Certainly, defendant can not blow hot and cold upon the same testimony, that is, can not be justified in complaining at one version and yet permitted to rely upon and urge another. If there was error in admitting Mrs. Wells' testimony as to this res gestae evidence—which I do not concede—then such error was rendered harmless by defendant's counsel voluntarily offering another version of the same testimony." Appellant accepted each of these bills with the said explanation and qualification and is bound thereby.

In discussing the admission of res gestae this court, through Presiding Judge White, said: "It is indispensable to a correct understanding of every transaction that every act attending it, verbal as well as physical, by whomsoever it may be committed, be placed before the court for its enlightenment. This rule as to res gestae overrides all other rules

known to the law governing the admissibility of testimony." (Cook v. State, 22 Texas Crim. App., 511.) Even the declarations of the wife, if res gestae, are admissible against her husband when on trial, even though she does not testify at all in the case. (Cook v. State, supra; Robbins v. State, 166 S. W. Rep., 528; see also Wilson v. State, 49 Texas Crim. Rep., 50; Kenney v. State, 79 S. W. Rep., 817.) Declarations made by a person who is incompetent to testify, are admissible as res gestae. Sec. 343, Branch's Crim. Law, and cases cited by him. "The fact that the statement is wholly or partially the opinion or conclusion of the declarant does not of necessity render it inadmissible if it is a part of the res gestae. Especially if the statement, though on its face might be a conclusion, is made as a statement of fact." (11 Ency. Ev., p. 318.) "It is not necessary that the declaration be a statement of fact to be admissible; a mere exclamation may constitute part of the res gestae, . . . although it does not directly state a fact." (11 Ency. Ev., p. 320.) In this connection see also 3 Wig. on Ev., sec. 1751, and 1 Wig. on Ev., secs. 656-658. The rules as to what are res gestae statements and when admissible are so stated, and the many cases of this court establishing and sustaining them by Mr. Branch in section 339 of his Criminal Law, that a mere reference thereto is sufficient. This court in the last few years, and up to the present time has so frequently discussed and stated these rules, citing the authorities, that we regard it as entirely unnecessary to again state and discuss them. We merely cite a few of them. Rainer v. State, 67 Texas Crim. Rep., 87, 148 S. W. Rep., 735; Ward v. State, 71 Texas Crim. Rep., 310, 159 S. W. Rep., 272; Renn v. State, 64 Texas Crim. Rep., 639, 143 S. W. Rep., 167; Girtman v. State, 73 Texas Crim. Rep., 158, 164 S. W. Rep., 1008, and the authorities cited in those decisions.

In our opinion the evidence objected to was res gestae and admitted in compliance with all the rules on the subject established by the authorities.

Sentence of the court in this case was for a specific ten years as found by the verdict of the jury. The judgment will here be reformed in accordance with the recent statute and so reformed will be affirmed.

*Affirmed.*